# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

|  |  |
|---|---|
| BERNARD ANTHONY SMITH, | |
| Plaintiff, | No. 15-CV-3094-LTS |
| vs. | **REPORT AND RECOMMENDATION** |
| CORNELL SMITH, et al., | |
| Defendants. | |

---

## I.   INTRODUCTION

This matter is before the court pursuant to a motion for summary judgment filed by defendants Cornell Smith, Kathy Weiss, Pam Wise, Darius Miller, Janet Stange, Bob Johnson, Jason Janssen, Robin Bagby, and John Baldwin (collectively, the State defendants) (Doc. 20), and a motion for summary judgment filed by defendants Mary Wittry, Muriel McDermott, and Lynn Wuebker (collectively, the County defendants). Doc. 26.   Plaintiff filed briefs in resistance to the motions for summary judgment (Docs. 25 & 29).   Defendants did not file reply briefs.

No party requested an evidentiary hearing or oral argument, and, in any event, I find them unnecessary.   The motions for summary judgment are fully submitted.   For the reasons set forth herein, I recommend the court grant both motions for summary judgment.

## II.    PROCEDURAL HISTORY

On February 11, 2015, plaintiff Bernard Anthony Smith (plaintiff) filed a pro se complaint alleging a violation of his civil rights.    Doc. 1.    On September 1, 2015, plaintiff filed a pro se amended complaint.    Doc. 7.    On the same day, the court appointed counsel to represent plaintiff.    Doc. 5.    On October 23, 2015, plaintiff filed, through counsel, another amended complaint (Amended Complaint).    Doc. 15.

In his Amended Complaint, plaintiff alleges that while incarcerated at the North Central Correctional Facility in Rockwell, Iowa (the NCCF), he was ordered to work at the Carroll County Recycling Center and Landfill (the Landfill).[1]    Docs. 15, at 1 & 6. This occurred between November 6 and 20, 2014.[2]    Plaintiff alleges that State defendants (all employees of the Iowa Department of Corrections), and the County defendants (all employees of the Landfill), failed to provide him with proper safety equipment or training for handling blood-borne pathogens; and, despite complaints, defendants required him "to pick up many potentially hazardous materials . . . including a blood-filled dialysis tube."    Doc. 15, at 7.    Plaintiff alleges that at the time he was "ordered to handle these materials, he had open wounds on his hands and arms."    *Id.* at 7-8.    Plaintiff alleges that, after he was exposed to potentially hazardous materials, defendants denied him appropriate medical tests to determine if he had been infected. *Id.* at 8.    Finally, plaintiff claims defendants' conduct was contrary to written policy. *Id.* at 8-9.

---

[1] The Amended Complaint does not identify who ordered him to perform the work, or who supervised his work.

[2] The Amended Complaint remarkably does not state when any of the alleged events occurred. The dates are found in the motion pleadings and supporting documents.

### III.   UNDISPUTED FACTS

Based on the parties' respective filings, the court finds that the facts set forth below, unless otherwise noted, are undisputed for purposes of the defendants' motions for summary judgment.

#### A. Relevant Parties

Plaintiff was an inmate formerly incarcerated at the NCCF.   Doc. 20-2, at 1. At the NCCF, defendant Cornell Smith was the Warden, Bob Johnson the Deputy Warden, Janet Stange the Executive Officer, Kathy Weiss a Nursing Supervisor, Pam Wise an Administrative Assistant, Darius Miller a Safety Officer, and Jason Janssen a Correctional Officer.   John Baldwin is a retired Director of the Iowa Department of Corrections (IDOC), and Robin Bagby is the IDOC Assistant Deputy Director.   *Id.*   At the Landfill, Mary Wittry was the Director, Muriel McDermott the Office Manager, and Lynn Wuebker a Landfill Operator.   Doc. 26-2, at 1.

#### B. Relevant Events

Plaintiff was incarcerated at the NCCF from June 27, 2014, until he was released to work release on February 10, 2015.   Doc. 20-2, at 2.   On July 1, 2014, the NCCF provided defendant with orientation about many topics, including hazardous chemicals and protective equipment.   Docs. 20-2, at 4; 20-3, at 44.   This included "instruction in the use of protective equipment."   Doc. 20-3, at 45.   It does not appear the orientation provided plaintiff with training or education regarding blood-borne pathogens.

Between September and December 2014, plaintiff obtained treatment at the NCCF on five separate occasions for various problems, such as hemorrhoids and breathing issues, unrelated to his work at the Landfill.   Docs. 20-2, at 2-3; 20-3, at 27-38.   These records do not contain any reference that plaintiff claimed he was injured as a result of working at the Landfill.   Indeed, despite his contact with medical personnel on four occasions in late November and early December 2014, plaintiff never once mentioned

his work at the Landfill or his possible exposure to blood-tainted trash. Had plaintiff suffered an injury while working at the Landfill, the NCCF would have provided him with medical services. Doc. 20-2, at 3.

The NCCF has an agreement with the Landfill, pursuant to Chapter 28E, Code of Iowa (2011), for the employment of inmates at the Landfill. Doc. 26-2, at 1. Plaintiff was assigned to the Landfill on a work release program to pick up trash. *Id*. He worked there, at least, on November 6 and 11, 2014. Docs. 20-3, at 52, 57-58; 25-2, at 1. Plaintiff was provided yellow gloves to help protect his hands, but was not provided with any other protective clothing or equipment. Doc. 25-2, at 1.

On November 14, 2014, plaintiff filed a grievance regarding his work at the Landfill. Docs. 20-2, at 4; 20-3, at 52. As a result of the grievance, NCCF improved training with regard to the Landfill litter project. *Id*. But, the grievance itself was denied on November 25, 2014. Docs. 20-2, at 5; 20-3, at 48-49. The warden affirmed the denial on January 14, 2015 (Doc. 20-3, at 46-47), and on January 20, 2015, it was further affirmed on appeal (Doc. 20-3). An Occupational Safety & Health Administration (OSHA) investigation resulted in a finding that no safety violations occurred. *Id*.

According to plaintiff's grievance, he claims that on November 6, 2014, he was "made to handle Biohazard products without proper training and P.P.E. equipment." Doc. 20-3, at 52. The grievance itself does not describe the products plaintiff claims he handled. It reflects plaintiff's claim that he told Kathy Weiss about his "exposure to potential blood borne pathogens." *Id*. The grievance references an attached "Kiosk Message."[3] *Id*. The grievance itself does not indicate when plaintiff brought this

---

[3] Although the parties do not explain what a Kiosk message is, it appears to be a form of electronic communication, similar to email, which permits inmates to communicate directly with staff. Perhaps the term derives from inmates having access to the communication device at kiosks located at various locations within the NCCF.

incident to any official's attention; but, in an appeal document, plaintiff indicated that he "contacted [his] work coordinator upon returning to NCCF on the 6th." Doc. 20-3, at 57.

The Kiosk message, dated November 6, 2014, at 7:49 p.m., states: "I pick up bloody Bio hazard bags, syringes & diapers filled with fecicies [sic]. I am not trained in blood and body fluid protocol." Doc. 25-4, at 3.

On November 7, 2014, defendant Wise responded to the Kiosk message, instructing plaintiff to check his work schedule because he was to work at the Landfill the week of November 10, 2014. Doc. 25-4, at 3.

On November 8, 2014, plaintiff sent a Kiosk message to defendant Miller requesting training for handling "Blood&Body fluid clean up and the proper [PPE] required to do so." Doc. 25-4, at 4.

On November 9, 2014, plaintiff sent a Kiosk message to defendant Weiss stating: "I would like to talk to you about some issues Im having. Im not comfortable talking through o-mail, it is not secure. Could you please set up an appointment and notify me." Doc. 25-4, at 4. There is no indication in this message that plaintiff was complaining of handling potentially hazardous materials. Defendant Weiss responded that plaintiff could see her on Thursday (November 13, 2014). Doc. 25-4, at 4. There is nothing in the record indicating whether plaintiff met with defendant Weiss that day, or what, if anything, he told her about having to allegedly handle potentially hazardous materials.

On November 17, 2014, defendant Weiss emailed defendants Stange and Wise noting that plaintiff asked Weiss "about protocol training" and that Weiss told plaintiff to speak to defendant Miller. Doc. 25-2, at 3-4. The email reflects that defendant Weiss asked plaintiff why he was interested and that plaintiff told Weiss about working

at the Landfill "and things can be bloody." *Id.* The email reflects that defendant Weiss told plaintiff to wear gloves. *Id.*

On November 18, 2014, defendant Miller interviewed plaintiff about the issue. Doc. 25-4, at 16. Plaintiff told Miller that on November 6, 2014, while plaintiff was picking up wind-blown trash around the perimeter of the Landfill, plaintiff "came across a bio-bag with bloody rags, syringes, and bio-hazard bag in it." *Id.* Plaintiff told Miller that he did not touch the bag, but asked Miller for a "post-exposure examination" because he believed he "may have been exposed to blood borne pathogens." *Id.* Plaintiff told Miller that plaintiff did not report the possible exposure incident to any staff at the facility or any of the correctional officers. *Id.*

On November 20, 2014, plaintiff sent a Kiosk message to defendant Wise about working at the Landfill that day and handling "bloody napkins, the Diapers & fecices [sic] and about a dialysis bag with the I.V. tube still connected to it with dried blood in it." Doc. 25-4, at 4. He also claimed he showed the items to Jason Janssen. *Id.* Plaintiff claimed "this is the third time you have sent me out there W/O blood and body fluid protocol training." *Id.*

Later that evening, defendant Wise informed plaintiff he was no longer assigned to work at the Landfill. Doc. 25-4, at 2.

On December 3, 2014, defendant Miller from the NCCF met with defendants McDermott and Wittry at the Landfill. Doc. 25-2, at 1. An email from defendant Miller about the meeting stated "it was apparent there was some confusion with regards to, who was giving the safety orientation training to the offenders, and what topics were required to be covered." Doc. 25-4, at 13. Defendant Wittry (Landfill Director) indicated that she thought defendant Wise was providing training to inmates about handling "the blood borne pathogen part of the safety training." *Id.* The email reflects that the Warden decided to keep inmates from working at the Landfill until the safety

training issues were handled, and that the NCCF believed it was the Landfill's responsibility to provide this safety training. *Id*. The email further reflected, that in the future, offenders will be instructed to leave "blood borne material" alone and to notify an escorting officer so that it could be handled by other staff. Doc. 25-2, at 2.

The DOC Offender Work Programs policy provides, in pertinent part, that "Offenders shall receive training in work duties, procedures and safety issues prior to beginning assigned work functions." Doc. 25-4, at 7. It further provides that "Community Service Agencies/Outside Agencies shall provide training and equipment appropriate to the work setting." Doc. 25-4, at 11.

The Agreement between the DOC and the Landfill provides, in pertinent part, that the Landfill "shall provide and document training necessary to safely and properly perform a particular task or service." Doc. 26-3, at 24. It further provides that the Landfill "shall provide all tools, equipment, clothing, materials, supplies or other items, including safety equipment or clothing, necessary for the task or service to be performed." *Id*.

Plaintiff does not claim any prior physical condition was aggravated or accelerated by the alleged exposure to hazardous material. Doc. 26-4, at 10. He has not been examined or treated by any medical personnel for injuries allegedly sustained as a result of the alleged exposure to hazardous material. Doc. 26-4, at 11-12. Plaintiff does not claim that he has been required to take any medication because of his alleged exposure. Doc. 26-4, at 13. There is nothing in the record before the court showing that plaintiff sustained any physical or mental injury as a result of the alleged exposure.

## IV.    SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(c). A fact is "material" if "it might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). An issue of material fact is "genuine" when "it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992), or when "a reasonable jury could return a verdict for the nonmoving party on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quotation and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50 (citations omitted), does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49 (citation omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475

8

U.S. at 587-88.   *See also Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, the court must view the facts "in a light most favorable to the non-moving party-as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them.") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).   The court does "not weigh the evidence or attempt to determine the credibility of the witnesses."   *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).   Rather, "the court's function is to determine whether a dispute about a material fact is genuine."   *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## V.    EIGHTH AMENDMENT STANDARDS

Title 42, United States Code, Section 1983, does not create rights.   Rather, it is a provision through which parties may vindicate violations of constitutional rights. Accordingly, the first step in the analysis is identifying the constitutional provision allegedly violated.   *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citation omitted). Plaintiff's Amended Complaint does not explicitly identify the Constitutional provision he claims defendants violated.   Rather, it generally references "constitutional rights" and "rights under the Constitution."   Doc. 15, at 8-9.   Nevertheless, in his briefs in opposition to the motions for summary judgment, plaintiff asserts defendants violated his Eighth Amendment right to be free of "cruel and unusual punishment."   *See*, *e.g.*, Docs. 25-3, at 5; 29-3, at 7.

The Eighth Circuit Court of Appeals has succinctly summarized the application of the Eighth Amendment to work assignments.    In *Ambrose v. Young*, 474 F.3d 1070 (8th Cir. 2007), the court stated:

> The Eighth Amendment's prohibition against "cruel and unusual punishment" applies to conditions of confinement, *see Rhodes v. Chapman*, 452 U.S. 337, 345-47, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981), and prison

> work assignments fall under the ambit of conditions of confinement, *Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir. 1993). The Eighth Amendment "forbids knowingly compelling an inmate to perform labor that is beyond the inmate's strength, dangerous to his or her life or health, or unduly painful," *Sanchez v. Taggart*, 144 F.3d 1154, 1156 (8th Cir. 1998), and requires supervisors to supervise and train subordinates to prevent the deprivation of a constitutional right, *see Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001).

*Ambrose*, 474 F.3d at 1075. Thus, an Eighth Amendment condition of confinement claim requires a plaintiff to prove both objective and subjective elements. Plaintiff must first establish there was an objectively obvious risk of harm that was sufficiently serious, and second show that government officials were subjectively aware of, and failed to respond to, the objectively serious harm. *Choate*, 7 F.3d at 1373. In other words, a plaintiff must show the officials were deliberately indifferent to the risk. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In the context of a condition of confinement claim, a prison official violates the Eighth Amendment by being deliberately indifferent either to a prisoner's existing serious medical needs or to conditions posing a substantial risk of serious future harm. *Compare Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (existing medical needs) with *Helling v. McKinney*, 509 U.S. 25, 34-35 (1993) (risk of future harm to health).

To the extent plaintiff claims defendants violated his right by not providing him with medical testing, that claim falls into a subcategory of conditions of confinement: deliberate indifference to a serious medical need. Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban on cruel and unusual punishments. *Farmer*, 511 U.S. at 828. As with other Eighth Amendment condition of confinement claims, a deliberate indifference to medical needs has both an objective and subjective component. To prevail on a claim of deliberate indifference, an inmate must show "that (1) the inmate suffered from an objectively serious medical need, and

(2) the prison official knew of the need yet deliberately disregarded it." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)).

Under the first requirement, an objectively serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (quoting *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991)). Under the second requirement, "an official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007) (citation omitted). "Although the level of blameworthiness must rise above negligence, a plaintiff does not have to show that the prison officials acted 'for the very purpose of causing harm or with knowledge that harm w[ould] result.'" *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (quoting *Farmer*, 511 U.S. at 835). Similarly, a claimant's "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)). The claim that an officer deliberately disregarded a risk is evaluated "in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." *Letterman*, 789 F.3d at 862 (quoting *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000)).

## VI. DISCUSSION

In order to determine if summary judgment is appropriate in this case, it is necessary for the court to determine several things. For purposes of this analysis, it appears plaintiff is making two claims: (1) An Eighth Amendment conditions of

confinement claim; (2) an Eighth Amendment deliberate indifference to medical needs claim.    As discussed above, each of these require plaintiff to prove both objective and subjective elements.    To make a condition of confinement claim, plaintiff must show he was exposed to a serious risk when defendants assigned him the task of cleaning up wind-blown litter at the Landfill, and that defendants were deliberately indifferent to an objectively serious risk.    To make a deliberate indifference to medical needs claim, plaintiff must show he had an objectively serious medical need and that defendants were deliberately indifferent to that need.    The court must also determine whether supervisors are responsible for any alleged constitutional violation either because they were directly involved in the conduct or because they failed to provide adequate training.    Finally, the court must address the County defendants' argument that they cannot be sued because they were not acting under color of law.    I address each of these issues below.

### A. Conditions of Confinement Claim

Plaintiff must show that defendants exposed plaintiff to an objectively serious risk to his health or safety, and that defendants were deliberately indifferent to that risk. *Farmer*, 511 U.S. at 834.    *See also Choate*, 7 F.3d at 1373 (holding that Eighth Amendment violations require both objectively harsh conditions of confinement and a subjectively culpable state of mind on the part of prison officials in creating or condoning those conditions).    Plaintiff must also show that he suffered some harm as a result of defendants' conduct.    *See*, *e.g.*, *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) (de minimis infliction of psychological pain is not actionable under the Eighth Amendment); *Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995) (holding that there is no constitutional violation where an inmate cannot show that he suffered an injury or adverse health consequence).    Plaintiff can show none of the above.

1. <u>Exposure to Objectively Serious Risk</u>

In determining whether defendants exposed plaintiff to an objectively serious harm, it is important to approach the question from the correct perspective. There is no real dispute that when a person comes into actual contact with another person's blood or other bodily fluids, such person is exposed to some potential harm because it is possible that the blood contains pathogens that could be harmful.[4] That is not, however, the focus of this inquiry. Rather, the focus here is whether defendants exposed plaintiff to an objectively serious risk of coming into contact with blood when they assigned him to pick up wind-blown trash at a Landfill.

Taking the evidence in the light most favorable to plaintiff, it appears plaintiff picked up some trash on one or more occasions that contained human blood or other body fluids or waste. There is certainly evidence in the record to the contrary. No other witness saw this alleged trash. All defendants deny plaintiff showed them the trash, or even told them about it until after plaintiff left the Landfill. Plaintiff apparently told defendant Miller that he did not touch the blood-tainted trash. It appears there is nothing supporting plaintiff's claim other than his own assertion. A bare assertion, unsupported by any other evidence, is generally insufficient to survive a motion for summary judgment. *See* FED. R. CIV. P. 56(c).

Nevertheless, the court need not rely on that ground to find summary judgment appropriate. First, plaintiff has proffered no evidence that he was actually exposed to the blood. There is no evidence that plaintiff's skin came into contact with the blood contaminated trash. Plaintiff was wearing gloves. He does not allege that the gloves failed or had holes in them or that that the blood permeated the gloves. Thus, plaintiff cannot show actual exposure to the blood contaminated trash.

---

[4] Though, in this case, there is no evidence that the blood contaminated waste plaintiff allegedly handled contained any diseases or pathogens.

Second, there is nothing in the record to support plaintiff's claim that defendants knowingly exposed him to blood-tainted trash. Plaintiff was assigned the task of picking up wind-blown trash and was provided yellow gloves to wear while handling the trash. There is nothing in the record showing that any defendant assigned plaintiff the task of picking up trash containing blood or other body fluids. Plaintiff alleges "he was required to pick up many potentially hazardous materials during [his] employment [at the Landfill], including a blood-filled dialysis tube." Doc. 15, at 7. The record, however, does not support a claim that any defendant specifically told him he was required to pick up a blood-tainted object, or that a defendant specifically placed plaintiff in proximity to such a blood-tainted object.

This case is similar to *Moore v. Moore*, 111 Fed. App'x 436 (8th Cir. 2004). In *Moore*, an inmate claimed he was exposed to possible bio-hazardous waste "by virtue of having to pick up cigarette butts and other refuse from the prison yard." 111 Fed. App'x at 438. The court affirmed the grant of summary judgment in favor of the defendants finding that the prison officials did not expose the plaintiff to serious risk of harm when the inmate had access to gloves and he was not required to pick up any items containing body fluids. 111 Fed. App'x at 439. In the case before this court, plaintiff has not provided any evidence that any defendant ordered him to handle trash that contained blood or other body fluids. Defendants provided plaintiff with protective gloves. To the extent he came across items that he believed constituted a bio-hazard, he could have left the item where he found it and notified his supervisor. The evidence in this case, even taken in the light most favorably to plaintiff, is that he did not notify anyone about the trash until after he picked it up.

This case contrasts sharply with other cases where courts have found prison officials exposed inmates to serious risk by requiring them to have contact with blood or other bio-hazards. For example, in *Fruit v. Norris*, 905 F.2d 1147, 1148 (8th Cir.

1990), prison officials required inmates to clean raw sewage out of a wet-well. In *Coker v. Dallas County Jail*, No. 3:05-cv-0005, 2007 WL 3022575, at * 20 (N.D. Tex. Oct. 17, 2007), prison officials forced an inmate to shower in an area covered with blood and excrement. In *Randles v. Hester*, No. 98-cv-1214, 2001 WL 1667821, at *3 (M.D. Fla. June 27, 2001), prison officials required an inmate to clean up blood spills, on three separate occasions, without furnishing protective clothing other than gloves. The striking difference in these cases is that prison officials were aware of the blood or body fluids and knowingly ordered the inmate to engage in conduct exposing them to potential harm. Here, prison officials ordered plaintiff to engage in picking up wind-blown trash, conduct that was not itself a known health hazard.

Third, plaintiff has proffered no evidence to establish that the use of yellow gloves constituted inadequate protection. Plaintiff's complaint simply assumes that the prison officials failed to provide adequate protective equipment when they provided him with only yellow gloves, but there is no evidence that the gloves were inadequate. Plaintiff has not come forward with written policies or procedures or guidelines establishing that defendants were required to provide him with some other, unidentified protective equipment. Plaintiff has not proffered any expert testimony or opinion suggesting the precaution of providing inmates with yellow gloves fell below the standard of proper protection. Rather, plaintiff's complaint and briefing simply assumes the court will conclude the gloves were inadequate.

Finally, the frequency and duration of exposure to the potential hazard is also important in determining whether something constitutes a serious risk under the Eighth Amendment. *See*, *e.g.*, *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001) (when considering the objective component of an Eighth Amendment claim, courts look to the frequency and duration of the condition and measures taken to alleviate the condition). Short-term or one-time exposure to a risk does not typically rise to the level

of a constitutional violation. *See Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994) (holding that not every deprivation rises to the level of an Eighth Amendment violation, particularly when it is brief). For example, in *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996), the court held that prison officials did not violate an inmate's Eighth Amendment rights when they left him in his cell exposed for four days to raw sewage from his overflowed toilet. In *Watson v. Charles*, No. 2:10-cv-321, 2011 WL 124649, at *3 (W.D. Mich. Jan. 14, 2011), the court held that an inmate's exposure on a single occasion to a shower stall where there was some blood mixed with soap scum and hair on the surfaces did not rise to the level of a constitutional violation. Here, at most, plaintiff was exposed to alleged bio-hazardous waste on November 6, 2014, and again on November 20, 2014.

## 2. Deliberate Indifference

Prison officials are liable for violating the Eighth Amendment in denying inmates humane conditions only if "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. In meeting this standard, an inmate must demonstrate that prison officials acted with deliberate indifference, not simply negligence or inadvertence. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). "What constitutes deliberate indifference has not been specifically defined." *Ambrose*, 474 F.3d at 1076. At its base, though, it requires evidence that prison officials were first aware of the risk. *See Farmer*, 511 U.S. at 837 (holding that a prison official cannot be held liable under § 1983 unless the plaintiff shows the official both knew of the facts from which an inference of risk could be drawn and that the official also drew that inference). Some "acts or omissions [are] so dangerous (in respect to health or safety) that knowledge of the risk can be inferred." *Fruit*, 905 F.2d at 1150 (internal quotation

and citation omitted). A plaintiff must, however, show something more than mere negligence. *Farmer*, 511 U.S. at 835.

Prior to November 6, 2014, there is nothing in this record to suggest that defendants had reason to believe plaintiff would be exposed to blood-tainted trash. Nothing in the record prior to November 6, 2014, suggests that plaintiff or any other inmate had come into contact with bio-hazardous waste while on the Landfill trash work assignment. Therefore, defendants could not have been deliberately indifferent to exposure to a serious risk they did not know existed.

Moreover, after plaintiff made that claim on November 6, 2014, prison officials investigated the claim and inquired into the training and protective gear provided to inmates. They discovered that, through some miscommunication, the training they believed the Landfill was providing included discussion of exposure to blood pathogens, while the Landfill believed the prison was handling this topic. Although this suggests possible negligence by defendants in training inmates for the possibility of exposure to potential bio-hazards, it does not rise to the level of deliberate indifference. *See Estelle v. Gamble*, 429 U.S. at 104.

After November 6, 2014, some defendants became aware of the potential hazard. The evidence shows that defendants Weiss, Wise, Miller, and Stange had varying degrees of knowledge of plaintiff's allegations after November 6, 2014, and before plaintiff alleges he again came across blood-tainted trash on November 20, 2014. The fact that these defendants did not prevent plaintiff from continuing to work at the Landfill, however, does not mean they were deliberately indifferent to a serious risk. There is no evidence in the record to suggest that defendants had reason to believe that plaintiff would again come across blood-tainted trash when, apparently, no other inmate working at the Landfill ever has. Further, the information available to defendants at this stage was only that plaintiff had picked up blood-tainted trash on November 6, 2014 (although

he denied touching the trash, according to defendant Miller's interview of plaintiff). There was no evidence that plaintiff had actual skin contact with the blood, or that the gloves he used were inadequate. Perhaps these defendants were negligent in not clearing up the training issue prior to allowing inmates to return to work at the Landfill, but their inaction does not rise to the level of deliberate indifference. In arriving at this conclusion, the court can also consider the lack of any motive these defendants had to knowingly expose plaintiff to a serious risk. *See*, *e.g.*, *Martin v. Byrd*, No. 4:07cv01184, 2008 WL 686936, at * 4 (E.D. Ark. March 10, 2008) (granting motion to dismiss complaint where there was no showing that prison officials had "any improper motive" when the inmate was required to sleep for four days on the floor due to overcrowding).

### 3. Harm

As previously noted, to establish a violation of his Eighth Amendment rights based on a condition of confinement claim, an inmate must prove that he suffers some identifiable physical or emotional harm or that the conditions prevented him from meeting one of his basic human necessities. *Hudson*, 503 U.S. at 8-9. *See also*, *e.g.*, *Watson*, 2011 WL 124649, at *3 (noting that an inmate did not allege that he was injured in any way or that he was actually exposed to pathogens when prison authorities required him to use a shower stall where blood was present on the surfaces); *Kennedy v. Aramark Corp.*, No. 13-2678, 2015 WL 1875905, at *8 (E.D. Penn. April 24, 2015) (granting summary judgment where plaintiff failed to show that any of his alleged injuries were caused by exposure to toxic oven degreasers he was required to use on a work detail).

In *Helling*, the Supreme Court held that the Eighth Amendment may protect future health problems. In *Helling*, an inmate sued claiming prison officials violated his Eighth Amendment rights when they roomed him in a cell with another inmate who smoked five

packs of cigarettes a day. 509 U.S. at 28. The inmate was unable, however, to show any evidence of existing medical problems traceable to his exposure to second-hand smoke. *Id.* at 29. The Court concluded that the Eighth Amendment protects inmates against future harm and an inmate need not wait until his or her symptoms arise. *Id.* at 34-35. The Court held that an inmate must still demonstrate that exposure to the potential harm was "contrary to current standards of decency" and that prison officials were deliberately indifferent to the risk. *Id.* at 35.

*Helling*, however, did not eliminate the requirement that a plaintiff show harm; rather, it eliminated the requirement that a plaintiff show evidence of immediate harm. In other words, in *Helling,* the plaintiff demonstrated that he was exposed to second-hand smoke over an extended period where he would have inhaled the smoke. Second-hand smoke can cause cancer. So the question there became whether the inmate had to await cancer symptoms before he could claim that exposing him to second-hand smoke violated his constitutional rights. *See Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995) (holding that "a prison official violates the Eighth Amendment by being deliberately indifferent *either* to a prisoner's *existing* serious medical needs *or* to conditions posing a substantial risk of serious *future* harm.") (emphasis in original). Here, in contrast, plaintiff has not shown harm because he has not shown that his skin actually came into contact with blood contaminated trash. Unlike the inmate in *Helling*, plaintiff cannot show a harmful substance entered his body. Plaintiff cannot show a substantial risk of serious future harm when he cannot show actual contact with the blood-tainted trash that only might have been contaminated. Accordingly, he cannot show either an existing medical need or conditions that posed a substantial risk of future harm. Plaintiff's claim that he was exposed to potential blood-borne pathogens which may in the future cause him harm, is, in the end, conjecture.

### B. Medical Needs Claim

The Eighth Circuit Court of Appeals has held that "[a] claim asserting deliberate indifference to a prisoner's serious medical need is thus best characterized as falling within a specific subcategory of conditions of confinement claims, not as a separate and distinct legal theory." *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995). Accordingly, to the extent plaintiff alleges that defendants were deliberately indifferent to his medical needs by refusing to provide him with testing as he requested, it is analyzed using the same objective and subjective test applied to the conditions of confinement work assignment claim plaintiff has also asserted.

Here, plaintiff alleges that defendants were deliberately indifferent to his medical needs because they did not provide him with testing to determine if he had been exposed to blood pathogens and did not provide him with vaccines. Plaintiff's claim fails both the objective and subjective tests. It also fails to establish that the failure to test him caused him harm.

Objectively, plaintiff has not been diagnosed with any medical problem. Nor are there facts that are so obvious that even a layperson would easily recognize the necessity for medical attention. As noted above, plaintiff has never claimed or established that his skin ever came into contact with any blood or other bodily waste or fluids. Plaintiff claims no symptoms, and alleges no medical problems as a result of his alleged exposure. There was nothing about plaintiff's conjecture that he might have been exposed to blood-borne pathogens that established an objectively serious need for him to be tested.

Subjectively, plaintiff has not established that defendants were deliberately indifferent. Defendants provided plaintiff with medical care throughout the time period in question. Doc. 20-2, at 2-3. Although plaintiff saw medical personnel four times after he claims he was exposed to blood-borne pathogens, he never raised the issue in those appointments. When, as here, there is no factual basis for defendants to believe

plaintiff was actually exposed to any bio-hazard, defendants cannot have been deliberately disregarding a risk by declining to subject plaintiff to tests based on speculation that he might have been exposed.

Finally, plaintiff cannot establish that defendants' failure to test him—for diseases he speculates he might have contracted—has caused him harm. Plaintiff has not since obtained any testing on his own, and therefore cannot demonstrate that he has any disease. It follows that he cannot, therefore, show that the failure to test him earlier caused him harm as a result, for example, from a delay in treatment. There is no evidence from which this court can conclude that, had defendants tested plaintiff, he would not have suffered a harm.

## C. Supervisor Liability and Failure to Train Claims

Plaintiff has brought suit against a large number of officials whose liability can, at best, rest only in their capacity as supervisors. In Count I of his Amended Complaint, he alleges "Defendants failed to properly train or ensure proper training and equipment was provided to Plaintiff before he began working at" the Landfill. Doc. 15, at 7. In Count II of his Amended Complaint he alleges that "Defendants failed to properly train plaintiff for his job" at the Landfill and "failed to follow IDOC's written policy" which required defendants to "provide proper training and equipment for the inmate workers." *Id.* at 8. Plaintiff does not, however, identify the specific defendants he alleges had responsibility to provide training or ensure compliance with IDOC procedures.

Supervisors cannot be held liable under a respondeat superior theory. *Fruit*, 905 F.2d at 1151. Nevertheless, "a supervisor may be held individually liable under § 1983 if he directly participates in a constitutional violation or if a failure to properly supervise or train the offending employee caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citation omitted). "This requires a

showing that the supervisor had notice that the training procedures . . . were inadequate and likely to result in a constitutional violation." *Id*. In other words, for liability to attach to a supervisor, "the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [the supervisor] can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

It is not entirely clear from plaintiff's complaint or briefs in resistance to the motions for summary judgment exactly which defendants he claims are directly liable, and which he claims are liable because of a failure to supervise. It appears, however, that plaintiff named State defendants Stange, Johnson, Bagby, Smith, and Baldwin, and all of the County defendants on the theory that they either failed to train or failed to properly supervise other employees because there is nothing in the Amended Complaint or the evidence in the record showing these defendants were directly involved with having plaintiff pick up trash or providing him with medical care.

Because plaintiff has failed to establish claims against any individual defendant, he cannot maintain his claims against these defendants in their supervisory capacity. *See Schoettle v. Jefferson County*, 788 F.3d 855, 861-62 (8th Cir. 2015) (noting that the Eighth Circuit Court of Appeals has "long held that neither municipal nor supervisory liability may attach in section 1983 actions unless individual liability is first found on an underlying substantive claim.") (citing *Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011)). Regardless, there is insufficient evidence here of a deliberate indifference to train or supervise employees to support claims against any of these defendants. The IDOC had a policy in place which required that inmates on work assignments be provided with proper training and safety equipment. Doc. 25-4 at 7. That policy further provided that outside agencies "shall provide training and equipment appropriate to the work setting." *Id*. at 11. The agreement between the IDOC and the

Landfill required the Landfill to provide all the necessary safety equipment. Doc. 26-3, at 24. It appears from the evidence that the NCCF thought the Landfill was providing training regarding handling potential bio-hazardous trash, while the Landfill thought the NCCF was handling this training. Doc. 25-4, at 13. Once this was discovered, the Warden took immediate steps to stop inmates from working at the Landfill until they could be trained in this area. *Id.*

As previously noted, at most, the evidence shows the employees in charge of work details at the Landfill were negligent in failing to train inmates for handling possible bio-hazardous waste, but it does not show they were deliberately indifferent to the inmates' safety. There is no evidence in the record that any supervisor was aware before the fact that the training was inadequate or was likely to result in a violation of inmates' constitutional rights. The policies were in place to provide the appropriate training and safety equipment and the failure, to the extent there was one, occurred when the employees did not provide the training to inmates. It is if anything, in other words, a failure by employees to execute, not a failure by supervisors to train.

Finally, plaintiff alleges defendants failed to comply with IDOC policies in training inmates for work assignments. Doc. 15, at 7. Even if some defendants failed to comply with the policies, that failure alone does not give rise to a § 1983 claim. A violation of state policy or laws does not constitute a violation of a constitutional right actionable under Section 1983. *See Marler v. Mo. State Bd. of Optometry*, 102 F.3d 1453, 1457 (8th Cir. 1996) (explaining that a violation of state law is insufficient for a claim under § 1983).

### D. County Defendants Acting Under Color of State Law

Finally, County defendants argue that they are not subject to suit under Section 1983 because they did not act under color of state law. Doc. 26-1, at 5-6. County

defendants argue they were "employees of a landfill and not acting 'under color of law.'" *Id.* at 6. The remainder of this section of the County defendant's brief addresses whether they had actual contact with plaintiff or forced him to pick up hazardous waste. County defendants do not address their status as government employees. Plaintiff argues that County defendants are subject to suit under Section 1983 because the Landfill entered into a contract with the NCCF. Doc. 29-3, at 10-12. Plaintiff also failed to address County defendants' status as government employees.

Section 1983 creates a cause of action against any "person" who, under color of state law, violates a party's federally protected rights. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (holding that for a party to be subject to suit under Section 1983, "the party charged with the deprivation [of a constitutional right] must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State."). Here, the Landfill is not a private party; it is a state actor. The Landfill is an operation of the Carroll County Solid Waste Management Commission. Doc. 26-3, at 21. The agreement between the NCCF and the Landfill specifically provides that "[t]he Carroll County Solid Waste Management Commission is another department or agency of the State of Iowa, a political subdivision of the State of Iowa . . . ." *Id.* As such, it and its employees acting in their official capacity are subject to suit under Section 1983. *See generally Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (holding that municipalities and other local government units are 'persons' under Section 1983).

Accordingly, County defendants are properly subject to suit in this case. That conclusion, however, is academic because, as stated above, there is insufficient evidence in the record to establish that any County defendant violated plaintiff's Eighth Amendment rights.

## VII.   CONCLUSION

For the reasons set forth herein, I respectfully recommend the Court **grant** the State defendants' motion for summary judgment (Doc. 20), and **grant** the County defendants' motion for summary judgment (Doc. 26).

Objections to this Report and Recommendation in accordance with 28 U.S.C. 636(b)(1) and FED. R. CIV. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.   Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.   *See* FED. R. CIV. P. 72.   Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.   *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).   Any response to the objection must be filed within 7 days after service of the objections.   A party asserting such objection must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections.   LR 72.1.

**IT IS SO ORDERED** this 15th day of June, 2016.


_____
C.J. Williams
United States Magistrate Judge
Northern District of Iowa